NOTICE
Decision filed 05/07/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240054-U

NO. 5-24-0054

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 22-CF-996 |
| | ) | |
| TROY L. COOPER, | ) | Honorable |
| | ) | Jeffrey K. Watson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CLARKE* delivered the judgment of the court.
Justices Barberis and Hackett** concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's conviction and sentence are affirmed where, under plain-error review, the record does not establish a clear or obvious violation of his sixth amendment right to public trial, and although the trial court improperly referenced a factor inherent in the offense at sentencing, the error was forfeited and does not warrant relief under the plain-error doctrine or as ineffective assistance of counsel.

¶ 2    Following a St. Clair County jury trial, the defendant, Troy L. Cooper, was convicted of involuntary manslaughter and sentenced to eight years' imprisonment. On direct appeal, the defendant argues that (1) his constitutional right to a public trial was denied by the trial court when

_____

*Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has read the briefs and listened to the oral argument recording.

**Justice Welch was originally assigned to the panel prior to his death. Justice Hackett was substituted on the panel and has read the briefs and listened to the oral argument recording.

it closed the courtroom to everyone after the actions of an unknown number of spectators caused a disturbance, and (2) the trial court erred in considering a factor inherent in the offense of involuntary manslaughter during sentencing. As an alternative to the sentencing issue, the defendant argues that his counsel was ineffective for failing to raise the sentencing error when it occurred or in a motion to reconsider the sentence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On July 8, 2022, the defendant was indicted for the June 19, 2022, shooting death of 3-year-old Joseph "Joe Joe" Lowe, and the aggravated battery with a firearm of 11-year-old Zion Williams, who were relatives of the defendant. The charges included two counts of first degree murder (720 ILCS 5/9-1(a)(2), (3) (West 2020)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), aggravated discharge of a firearm toward the vehicle the victims were in (*id.* § 24-1.2(a)(2)), and two counts of unlawful use of a weapon by a felon (UUWF) (*id.* § 24-1.1(a)). The UUWF counts were severed for a separate trial.

¶ 5      On June 5, 2023, a jury was selected, opening statements were given, and the jury heard testimony from one of the State's witnesses, Crystal Brooks (the mother of Lowe). The following day, the record reflects that the trial court issued repeated admonishments to the gallery regarding appropriate courtroom behavior. Early in the trial, the trial court stated:

> "Ladies and gentlemen of the gallery, before we bring the jury in, I am catching
>
> reactions, facial expressions, gasps or disagreement. That is not your role here. I want to
>
> remind all of you that you are in a court of law. You are free to observe, and I know and I
>
> understand that this is an emotional case. But your reactions can influence these people and
>
> that may not be—you know, whichever side you're here to support, you could inadvertently
>
> be hurting that side by doing that. So I have to ensure that both parties get a fair trial. If

2

your conduct rises to the point, I'm going to ask the bailiff to have you removed. Okay? I don't want to do that. I know that you all—obviously you all have an interest in this matter or you wouldn't are [*sic*] here. And, again, you're welcome to observe. But the reactions, the gasps, I can't tolerate that. I can't have it. Does everybody understand that?

(Gallery acknowledges.)"

¶ 6    Later that same day, during the cross-examination of a witness, the bailiff interrupted court proceedings to warn a member of the gallery about disruptive behavior, noting that if there were any more interruptions, the spectator would be asked to leave. Soon after, outside the presence of the jury, the trial court addressed the gallery:

"Ladies and gentlemen of the gallery, I'm going to remind you again, there are not to be any outbursts. I will not have you disrupting my courtroom. Is anybody unclear about that? One more outburst and I'm going to start banning people from this courtroom. If it continues, I'm going to start sanctioning people. That includes contempt of court. Do we all understand that?

(Gallery acknowledges.)

My patience is over now. I asked you nicely. Now I'm telling you. No other disruptions from the gallery. Understood?

(Gallery acknowledges.)"

¶ 7    On June 7, 2023, during the lunch break of the third day of trial, a disturbance occurred among members of the gallery in the hallway of the courthouse. At approximately 2:05 p.m., once the trial court had reconvened in the presence of the jury, it stated:

3

"Back on the record in 22-CF-996, People versus Troy Cooper. Court is back in session. The time is about 2:05. All parties are present. The jury is present here in the courtroom.

During our lunch break we had some issues with the gallery. As a result of what the Court can only discern as all of the gallery's conduct, the Court will proceed in a closed proceedings.

Ladies and gentlemen of the jury, I apologize for whatever events took place in the hallway. I didn't see them. They were brought to my attention. There's been some other matters involving members of the gallery. The safety of everybody in this room is my first, and foremost, concern.

As a result of that and with the assistance of our bailiffs and our sheriff's department, we will proceed in a closed proceeding from now on. Once you come in the box, we will secure the door. We're not going to allow members of the public back in. They have forfeited that right by their own behavior.

So I apologize for the delay. I think we've got everything under control. Again, I want to thank Alex in particular for his quick action in helping to diffuse the situation, the members of our other security staff here, and the St. Clair County Sheriff's Department have completely diffused the situation. They have ensured that the members of the gallery that have been here throughout the week have been removed from the premises. They will not be coming back. Okay?"

¶ 8     Thereafter, Agent Ola Abdallah returned to the stand to complete cross-examination. Then Dr. Matthew Matlock, an emergency room doctor, testified to treating Williams for a relatively minor in-and-out gunshot wound to his arm. Lastly, Dr. Tatiana Bihun, who performed the autopsy

on the deceased victim, Lowe, testified that the minor had a single gunshot wound to the back of the head, which caused his death. The State then rested, and the jury retired for the day at approximately 2:45 p.m. Before the jury left the courtroom, the trial court stated:

> "Folks, it's brought to my attention, I'm going to make sure you get to your vehicles safely. So we'll have you escorted to your vehicles. Okay? I know some of you expressed concern over that, so we will certainly be happy to provide that for you. Why don't you have them gather once they leave here out by the chief's desk and then we'll work out the logistics."

¶ 9    The next morning, on June 8, 2023, in the presence of the jury, the trial court stated:

> "Ladies and gentlemen of the jury, first of all, I'm getting better. Only 15 minutes today. Again, there were some matters—I know some of you saw me out front today. There were some matters that I had to address in particular with the events of yesterday.
>
> So you know, additional measures are being taken today so that we don't have any incidences like we did yesterday. We have additional personnel. It has been the collective decision after conferring with the Chief Judge and the Sheriff's Department, any of the folks that have been here all week that were involved in the incidents of yesterday will be turned around at the courthouse steps, and they will not in [*sic*] allowed to attend these proceedings going forward. So we have taken steps through the courthouse cameras to identify those individuals. The deputy sheriffs are aware, and they will be diligently working to continue to keep our courthouse safe."

¶ 10    Following the conclusion of the trial, the jury found the defendant guilty on the lesser-included offense of involuntary manslaughter as it related to the first degree murder charge in count I. Additionally, the jury found the allegation that the defendant personally discharged a

5

firearm that proximately caused the death of Lowe was proven. The jury found the defendant not guilty on the remaining counts.

¶ 11    On December 27, 2023, the trial court conducted the sentencing hearing. At the outset, the trial court denied the defendant's posttrial motion and proceeded to sentencing, noting it had reviewed the presentence investigation report and relevant materials. The State introduced certified copies of the defendant's prior convictions—including burglary, escape, unlawful possession of a firearm, and abuse and neglect of a child—and argued several statutory factors in aggravation applied. The State emphasized that the defendant's conduct "caused or threatened serious harm" to numerous people present during the shooting. With respect to this argument, the State explicitly stated that it was not asking the court to consider the defendant's conduct in harming the deceased child because "that's inherently [part of] the offense of involuntary manslaughter." The State urged the court to impose an extended-term sentence based on the defendant's criminal history, the victim's age, and the need for deterrence in light of "simply too much gun violence" in the community.

¶ 12    In mitigation, defense counsel presented and read a letter from Priscilla Burton, a daycare provider to the defendant's children, which stated that the defendant is an active father and the children have improved since their father has been home. Counsel argued that the defendant had not intended to harm anyone but was instead attempting to break up a fight. The defendant presented evidence that he had obtained employment, started a small business, and supported his children while released on bond after the trial. The defendant delivered a lengthy statement in allocution, apologizing to his family and asserting that he had been attempting to break up a fight.

¶ 13    The trial court, after hearing evidence and arguments, stated that the factors it was "going to weigh in aggravation are the defendant's conduct, which caused death, his history of criminal

6

activity, which includes the unlawful possession of a firearm, abuse and neglect of a child, assault, escape, burglary," and the need to deter others, and further observed that the defendant "should never have had a gun to begin with" as a convicted felon and that the jury had specifically found he personally discharged the firearm that caused the death of a child. After acknowledging that the defendant did not intend to kill the child and noting the victim was "a three-year-old toddler" who "wasn't threatening harm to anybody that day," the trial court found that a sentence of probation would deprecate the seriousness of the crime and imposed an eight-year extended-term sentence of imprisonment. This appeal timely followed.

¶ 14                                    II. ANALYSIS

¶ 15    On appeal, the defendant raises two issues. He first contends that his sixth amendment right to a public trial was violated when the trial court allegedly closed the courtroom on June 7 and maintained that closure thereafter. Next, he argues that the trial court improperly relied on a factor inherent in involuntary manslaughter—namely, the victim's death—in aggravation, warranting a new sentencing hearing under plain-error or ineffective assistance principles.

¶ 16                                    A. Public Trial

¶ 17    The defendant argues that the court violated his sixth amendment right to a public trial by ordering a complete closure of the courtroom on the afternoon of June 7 and, according to the defendant, maintaining that closure for the remainder of the trial. He contends the closure failed to satisfy the four-factor test required by *Waller v. Georgia*, 467 U.S. 39 (1984), and constitutes structural error requiring reversal. The defendant acknowledges that this claim is forfeited and must be reviewed under plain-error analysis. Additionally, the defendant argues that if any ambiguity exists regarding whether the June 7 closure continued into June 8, this court should remand for a factual clarification hearing under Illinois Supreme Court Rule 329 (eff. July 1, 2017).

The State responds that (1) the closure lasted only a short period on June 7, (2) the courtroom reopened the next morning to all except those specifically identified in the hallway disruption, (3) the closure was justified under *Waller*, and (4) because the defendant failed to object, he must satisfy the clear or obvious error threshold under *People v. Radford*, 2020 IL 123975, which he cannot do.

¶ 18    Before addressing the merits, the parties dispute the appropriate standard of review. The defendant asserts that whether a public trial violation occurred is reviewed *de novo*, relying on *People v. Schoonover*, 2021 IL 124832, ¶ 19. The State argues for an abuse of discretion standard of review, citing appellate court decisions applying that standard to a trial court's factual determinations regarding spectator conduct. See *People v. Seyler*, 144 Ill. App. 3d 250, 252 (1986); *People v. Cooper*, 365 Ill. App. 3d 278, 282 (2006). Both standards apply, but to different questions. We review the trial court's factual determinations—such as findings about spectator conduct or security concerns—for abuse of discretion. *Id.* But the ultimate question—whether the closure violated the defendant's constitutional right to a public trial, and whether the forfeited claim is reviewable under plain error—is a legal question reviewed *de novo*. See *Schoonover*, 2021 IL 124832, ¶¶ 19, 26.

¶ 19    Because the defendant did not object to the closure at trial or raise the issue in a posttrial motion, the claim is forfeited and subject to the plain-error doctrine. *People v. Sebby*, 2017 IL 119445, ¶ 48. Under either prong of the plain-error doctrine, the threshold question is whether a clear or obvious error occurred. *Radford*, 2020 IL 123975, ¶ 24. This threshold is especially significant in courtroom-closure cases because a contemporaneous objection is "particularly crucial" to allow the trial court to refine or explain its approach. *Id.* ¶ 37. A courtroom may be closed only if (1) an overriding interest is likely to be prejudiced, (2) the closure is no broader than

necessary, (3) reasonable alternatives are considered, and (4) adequate findings support the closure. *Waller*, 467 U.S. at 48.

¶ 20 On this record, we cannot say the trial court committed a clear or obvious error. Here, the record reflects escalating misconduct by members of the gallery. On June 6, the trial court admonished spectators twice about audible reactions, disruptive conduct, and the potential for removal. A bailiff also issued a warning. On June 7, during a recess for lunch, a disturbance in the hallway required intervention by security personnel. When the trial court resumed at 2:05 p.m., it announced it would "proceed in a closed proceeding from now on" due to what it could only discern as "all of the gallery's conduct." Three witnesses then testified, and the jury broke for the day at 2:45 p.m.

¶ 21 The defendant relies on the phrase "from now on" to argue a total closure persisted. The following morning, however, the trial court informed the jury that additional security measures had been implemented and that the "individuals involved in the incidents of yesterday" would not be permitted to enter the courthouse. The trial court referenced surveillance footage used to identify those individuals. Nothing in the record affirmatively indicates that the trial court continued to bar all members of the public from attending. Although the defendant argues the absence of an express rescission of the prior afternoon's statement implies a continuing blanket closure, the practical effect of the court's actions on June 8—describing and implementing a narrower, individualized exclusion—indicates that the broad clearing of the courtroom on June 7 did not persist. Where, as here, the record does not affirmatively establish a continued total closure, and the defendant failed to object at the time, we do not presume one; any doubts arising from gaps in the record are resolved against the appellant. See *People v. Lopez*, 229 Ill. 2d 322, 344 (2008).

9

¶ 22    To the extent the defendant argues that any ambiguity regarding June 8 requires a remand for a Rule 329 hearing, we disagree. Rule 329 addresses "material omissions or inaccuracies" in the record, not ambiguities created by the defendant's failure to object. See Ill. S. Ct. R. 329 (eff. July 1, 2017). The issue here is not an inaccurate transcript, but whether the defendant may rely on ambiguity created by his failure to object to establish clear or obvious error. Under *Radford*, a contemporaneous objection is "particularly crucial" in courtroom-closure cases so the trial court can explain its reasoning and develop an accurate record. *Radford*, 2020 IL 123975, ¶ 37. Such an objection "prevents a defendant from potentially remaining silent about a possible error and waiting to raise the issue, seeking automatic reversal only if the case does not conclude in his favor." *Id.* When no objection is made and the record is therefore underdeveloped, any doubts arising from that incomplete record are resolved against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Because the claimed ambiguity arises from the defendant's failure to object and not from any inaccuracy within the record, a Rule 329 hearing is neither necessary nor appropriate.

¶ 23    We now turn to the *Waller* factors. As the defendant concedes, the first factor is satisfied: the trial court had an overriding interest in ensuring the safety of the jurors, attorneys, witnesses, court staff, and the orderly administration of justice. The June 7 hallway disturbance involved enough individuals to raise immediate concern. As to the second factor, whether the closure was no broader than necessary, the trial court's initial clearing of the entire gallery on June 7, apart from interns associated with either the State or defense counsel, was the result of an unexpected security disturbance serious enough to require intervention and delay proceedings. It delayed the trial court in recommencing proceedings by almost an hour, where the jury did not reconvene until 2:05 p.m. after lunch. Because the trial court did not observe the incident firsthand, reliance on

10

security personnel to discern the extent of the gallery's involvement and conduct was unavoidable. Further, the temporary closure was brief—approximately 40 minutes of testimony before the jury broke for the day—and the trial court shifted to individualized exclusions the following morning. In light of the fast-moving circumstances the trial court faced and the lack of any contemporaneous objection, we cannot say the trial court's temporary response to an immediate security disruption amounted to a clear or obvious error under plain-error review. As to the third factor, the record reveals the trial court considered alternatives. Before June 7, it issued multiple warnings and attempted to manage the situation without removing spectators. On June 8, the trial court implemented the less restrictive alternative of barring only the specifically identified individuals involved in the disturbance, after it and security personnel had an opportunity to review surveillance video. These steps, although not perfect, undermine the claim of clear or obvious failure to consider reasonable alternatives. Regarding the fourth factor, the trial court articulated on the record its concerns about the gallery's conduct and the safety of all present. The trial court even went so far as to have security personnel escort members of the jury to their vehicles. While the findings were not extensive, *Waller* does not require ritualistic recitations, and *Radford* makes clear that in the absence of a contemporaneous objection, a lack of detailed findings does not automatically constitute clear or obvious error.

¶ 24     Accordingly, the defendant has not shown that the trial court's actions amounted to a clear or obvious *Waller* violation. In fact, the actions of the trial court appear necessary from this record to ensure the safety of those present. The immediate safety concerns, the brevity of the closure, the shift to targeted exclusions the following morning, and the absence of any contemporaneous objection all weigh against finding plain error. Because the defendant has not satisfied the threshold of plain error, we do not reach the second prong of plain error or conduct structural-error

11

analysis under *People v. Moon*, 2022 IL 125959. We therefore decline to excuse the defendant's forfeiture.

¶ 25                                    B. Sentencing

¶ 26    The defendant next argues that the trial court improperly considered a factor inherent in involuntary manslaughter—namely, "the defendant's conduct, which caused death"—as aggravation, warranting a new sentencing hearing. The State concedes the reference was inartful but asserts that the sentence rested on proper factors and that, under *People v. Johnson*, 2024 IL 130191, the claim cannot succeed on second-prong plain error; nor is first-prong plain error established because the evidence was not closely balanced.

¶ 27    A court may not treat a factor implicit in the offense as aggravation. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004); *People v. Conover*, 84 Ill. 2d 400, 404-05 (1981). Reversal is warranted if the record fails to positively rebut reliance on the improper factor; conversely, remand is unnecessary where the record shows the factor was incidental and the sentence was driven by proper considerations. *People v. Heider*, 231 Ill. 2d 1, 21-22 (2008). Because there was no objection and no postsentencing motion, the claim is forfeited. *Sebby*, 2017 IL 119445, ¶ 48. Under *Johnson*, consideration of an improper aggravating factor is not structural error and therefore does not qualify for second-prong plain error; such claims are instead evaluated, if at all, under first-prong plain error review. *Johnson*, 2024 IL 130191, ¶¶ 90-92, 95.

¶ 28    Here, the trial court's reference to "the defendant's conduct, which caused death" was improper because death is inherent in involuntary manslaughter. *Phelps*, 211 Ill. 2d at 11. Nonetheless, the defendant does not demonstrate first-prong plain error. As detailed in the background section, the aggravating evidence presented at sentencing was substantial, and nothing in the record suggests the mitigation evidence approached the same weight. Under first-prong plain

error, the defendant must show that the improper remark could reasonably have tipped the balance of factors in his favor; here, we find that the sentencing evidence was not closely balanced.

¶ 29    The trial court emphasized defendant's significant criminal history (burglary, escape, child abuse/neglect, domestic assault, unlawful possession of a firearm), prior failures on probation, deterrence, the victim's age (three years) supporting extended-term eligibility, and the jury's personal-discharge finding. The court concluded that a sentence of probation would deprecate the seriousness of the offense. It therefore imposed an eight-year mid-range extended-term sentence, two years below the State's requested maximum, further indicating that the improper remark did not control the outcome. Moreover, the record positively rebuts any inference that the improper reference drove the outcome. The State expressly acknowledged that death is inherent in involuntary manslaughter and stated it was not asking the court to rely on the victim's death as aggravation. The trial court's analysis centered on the defendant's criminal history, the need for deterrence, the victim's age, and the personal-discharge finding—all proper considerations. In context, the isolated reference to death was incidental and not decisive, and thus not a basis for relief under *Heider* or *Johnson*. First-prong plain error is not established.

¶ 30    The defendant also contends that trial counsel was ineffective for failing to object to the improper factor at sentencing. To prevail, a defendant must show deficient performance and prejudice—a reasonable probability that, but for counsel's error, the result would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). Assuming deficiency, the defendant cannot demonstrate prejudice. For the reasons discussed, the record shows the sentence rested on proper aggravation, and the court articulated reasons independent of the improper reference. There is no reasonable probability that a different

13

sentence would have been imposed had counsel objected or filed a motion to reconsider. Accordingly, the ineffective-assistance claim therefore fails.

¶ 31                                   III. CONCLUSION

¶ 32    For the foregoing reasons, we affirm the defendant's conviction and sentence. The defendant has not established a clear or obvious violation of his public-trial right, and his sentencing claim is forfeited and does not warrant relief under the plain-error doctrine or as ineffective assistance of counsel.

¶ 33    Affirmed.